# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 4, 2007

## STATE OF TENNESSEE v. TORRIE PERKINS

**Appeal from the Circuit Court for Haywood County**
**No. 5271     Clayburn Peeples, Judge**

---

**No. W2007-00879-CCA-R3-CD  - Filed April 29, 2008**

---

The defendant, Torrie Perkins, appeals from convictions of first degree murder and attempted first degree murder rendered by a Haywood County Circuit Court jury, for which he was sentenced to concurrent terms of life without parole and twenty-five years.  In his appeal, he challenges the sufficiency of the evidence.  We affirm the judgments of the trial court but remand the case for correction of the judgment for the first degree murder conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed,**
**Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which DAVID G. HAYES and ROBERT W. WEDEMEYER, JJ., joined.

J. Colin Morris, Jackson, Tennessee, for the appellant, Torrie Perkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Garry G. Brown, District Attorney General; and Edward L. Hardister, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case involves the shooting death of sixteen-month-old Jamarius Thompson in his home on Christmas Day 2003.  Jamarius was a bystander in an altercation in which the defendant shot at Andre Middlebrooks and struck Jamarius instead.

JaVaughn Thompson testified that on Christmas Day 2003, she was living with Harzel Tyus, Andre Middlebrooks, and Jamarius.  She identified Harzel Tyus as her boyfriend and Jamarius as her sixteen-month-old son.  She said that on that evening, Melvin Taylor, Gary Flagg, and her sister Tanika were also at her home.  She said the defendant knocked on the door about 9:00 p.m.  She said that the defendant entered and that he and Tyus went into a bedroom to talk for two or three minutes.  She said that as the defendant was leaving, he "peeped" in a side bedroom and saw Taylor and that

he stormed out the door. She said the defendant returned two or three minutes later with Evan Sturdivant. She said that the defendant told Sturdivant to "handle his business" and that Sturdivant attacked Middlebrooks and "put him in some kind of wrestling move." She said the defendant pulled out a gun and hit Middlebrooks in the back of the head with it twice. She said that she moved to get her son but that the defendant said, "Nobody moves, nobody get hurt," and pointed a gun at Tanika and her. She said Middlebrooks got away from Sturdivant and was running toward the bedroom. She said Tyus kept saying, "Man, don't shoot that gun 'cause my baby in here." She said Jamarius was in the bedroom standing by Tyus's leg. She said that as Middlebrooks ran toward the bedroom, the defendant fired a shot, which struck Jamarius. The defendant and Sturdivant fled. She said they were unable to call 9-1-1 because the keypad on the cellular telephone was locked, and instead, Middlebrooks drove Jamarius, Melvin, and her to the emergency room. She said Jamarius died from his injuries that night.

On cross-examination, Ms. Thompson said Tyus had told her the previous evening that Taylor and someone had been in a fight at a party. She said that she did not know with whom Taylor had fought but that she had understood it was not Middlebrooks. She said that five to ten seconds elapsed between the time that Sturdivant attacked Middlebrooks and when the victim was shot. She later said it took Middlebrooks "probably a minute or two" to free himself from the wrestling hold. Ultimately, she said she did not know how long elapsed from the struggle until the victim was shot. She said that she did not allow smoking or drug use around her baby and that she was unaware of any drug use in the house that evening.

Tanika McCuller testified that she was JaVaughn Thompson's sister and Andre Middlebrooks' cousin. She said that after celebrating Christmas Day 2003 at their mother's house, she went with Thompson and the victim to Thompson's house. She said that the defendant came to the house at about 10:00 and spoke with Tyus in a bedroom and that she did not think the defendant saw Taylor in the other bedroom until the defendant was leaving. She said the defendant left but then returned after two to three, but not more than five, minutes with Evan Sturdivant. She said that the defendant told Sturdivant to "handle his business," that Sturdivant attacked Middlebrooks, and that the defendant hit Middlebrooks on the head with the gun. She said that Middlebrooks and Sturdivant were rolling around on the floor fighting and that Tyus told the defendant not to shoot because "Shorty" was in the house, referring to his son. She said Tyus warned the defendant twice not to shoot. She said that the defendant fired the gun and that she heard one or two shots. She said it appeared the defendant was shooting at Middlebrooks, who was on the floor. She said the defendant backed out of the house after Ms. Thompson said that her baby had been shot. She said that when she realized the victim had been struck by a bullet, she retrieved the cellular telephone from the bedroom but was unable to get it unlocked. She said that a group from the house took the victim to the emergency room and that Tyus stayed at the house to talk to the police.

Ms. McCuller testified that she heard other gunshots outside the house that night, but she could not say how many she heard. She said the defendant was the only person inside the house with a gun. She said that when the defendant left the house the first time, he was saying, "Let me holler

at you," to Melvin Taylor. She said that the defendant did not appear angry but that the tone in which he said it "wasn't in a good way." She estimated that the fight between Middlebrooks and Sturdivant lasted about three or four minutes. She did not know how many seconds elapsed between the time Middlebrooks broke free of the struggle with Sturdivant and when the defendant shot the gun, but she said, "It was quick."

Andre Middlebrooks testified that on Christmas 2003, he was staying at Harzel Tyus's house. He was at the house preparing to go out with Tyus, Gary Flagg, and Melvin Taylor, when the defendant came over to talk to Tyus. He said the two talked in a back room for about five minutes and that as the defendant was leaving, the defendant saw Flagg in Middlebrooks' bedroom and said, "What's up?" but then "sped on out the house" after seeing Taylor in the room with Flagg. He said the victim was in the living room during the defendant's first visit.

Middlebrooks testified that the defendant returned in about two or three minutes with Evan Sturdivant, and he later admitted he had given a statement in which he estimated that the defendant returned with Sturdivant in fifteen seconds. He said the defendant looked different when he returned, and he described the look as evil or mad. He said the defendant said he wanted to talk to Taylor and told Sturdivant to "handle [his] business" with Middlebrooks. He said he was not paying any attention until "I seen him he was trying to steal on me." He said that Sturdivant jumped on him without any discussion, that he "balled up," that he struggled with Sturdivant, that he could feel the rings on Sturdivant's fingers hitting him, and that Sturdivant got him in a choke hold. He said the defendant hit him across the head with a pistol about three times. He said the defendant told everyone not to move. He was able to break free, saw the defendant aiming the gun at him, and heard about two shots. He said he went into a bedroom, tripping on the way, and got under the bed. He heard other shots outside. He said that he had also seen a black gun tucked into Sturdivant's pants but that the defendant was the one who pointed a gun at him. He said he did not see the victim during this altercation until after the victim had been shot.

Mr. Middlebrooks testified that Sturdivant told someone else that Middlebrooks looked like Brian Brummitt, who had "jumped on him." Middlebrooks said he never fought with Sturdivant. He said the defendant, Taylor, and Tyus "had got into it about three weeks [before Christmas 2003] . . . at a gas station." He said he had never been able to figure out why Sturdivant jumped on him. He said that one possibility was due to Sturdivant's relationship with Middlebrooks' "baby's momma." He denied any involvement in a fight the previous evening.

Harzel Tyus testified that he was the victim's father. He said that on Christmas 2003, he and JaVaughn Thompson lived together. He said that he had known the defendant since childhood and that they were friends. He said he was at home with Thompson, McCuller, Middlebrooks, Taylor, Flagg, and the victim at about 9:15 or 9:30 p.m. when the defendant came to the house. He said he thought it was strange that the defendant came to his house because he had heard rumors that the defendant and Taylor had an altercation. He said the defendant had a towel in his hand and that the defendant's jaw was swollen. He said he saw his cousin Evan Sturdivant's car outside about twenty or thirty feet from the house.

Tyus testified that he took the defendant into one of the two bedrooms and that Taylor and Flagg were in the other bedroom. He said the defendant asked, "Man, what's wrong with Melvin [Taylor] and them guys. What's wrong with the guys?" He said the defendant said, "You know, I'd never do nothing to hurt you or your family." Tyus said that Taylor was a person who "would get some stuff started." He said he and Middlebrooks had given Taylor a ride home from a Christmas Eve party at which Taylor had an altercation with Sturdivant and Alvin "Space" Williams, although he said the defendant had not been involved. He said the defendant had been in an altercation with Taylor and Gerald Brummitt a day or two earlier. Tyus testified that he told the defendant to leave the situation alone. He said, "I believe [the defendant] did say it was gonna to be some trouble." He said that as the defendant left the bedroom, the defendant looked in the other bedroom and saw Taylor, which he said made the defendant move faster. He thought the defendant said, "Let me holler at you," to Taylor but that Taylor ignored the defendant. He said the defendant did not slam the door when he left.

Tyus testified that the defendant returned after five to ten minutes. Tyus was in his bedroom changing clothes, and he stepped into the doorway with the victim. He said that the defendant had a black and gray automatic gun and that Sturdivant was behind him. He said the defendant instructed that if no one moved, no one would be hurt. He said the defendant was pointing his gun at Thompson and McCuller, who were on the couch, when he said this. Tyus said he told the defendant not to shoot the gun in the house because his baby was standing beside him. He said Sturdivant grabbed up Middlebrooks from the couch, tussled with him, and put him in a "full Nelson." He said the defendant hit Middlebrooks over the head once with a pistol. Middlebrooks escaped and tripped over a cable cord when he was trying to run, falling toward the bedroom door where Tyus and the victim were standing. He said the defendant immediately fired one shot, which struck the victim, although Tyus did not realize at first that the victim had been shot. He said the defendant and Sturdivant left through the front door. He said that after the first shot, he heard two shots outside and heard Taylor yelling, "Let me in! Hey, let me in!" He said he opened the back door and Taylor fell inside. He said Taylor and Flagg had gone outside through a window.

Tyus testified that he was on parole and that there were no guns in his home. He said Sturdivant did not pull out a gun and that no one other than the defendant fired a gun inside the house.

Tyus testified that there were not problems between Middlebrooks and the defendant. He said Sturdivant told the defendant that Middlebrooks had jumped on him at the party on Christmas Eve. Tyus said the person who attacked Sturdivant was Brian Brummitt, not Middlebrooks.

Tyus acknowledged that he had three felony convictions for possession of cocaine with attempt to sell. The convictions all occurred in 1995.

Doctor O'Brien Clary Smith testified as an expert forensic pathologist about the autopsy of the victim. He said the victim's cause of death was a gunshot wound to the face. He said the victim had a gunshot wound to the right side of the face at the cheek area with the path of the bullet having

-4-

gone down across the back of the mouth, fracturing the hyoid bone, traveling through the left internal jugular vein, and exiting the body in alignment with two other gunshot wounds to the left shoulder. He said it was possible that all four entry and exit wounds were caused by one bullet. He said the injury would have produced death within minutes.

Detective Lewis Crider of the Brownsville Police Department testified that he investigated the crime scene. He said three shell casings were recovered toward the rear of the house. Two projectiles were recovered from inside the house, one from the kitchen floor and the other from the kitchen wall. A slug was recovered from the wall of the bedroom used by Tyus and Thompson. He identified photographs of the house. He said several people were investigated as possible defendants.

Lieutenant Shaun Williams of the Brownsville Police Department testified that he investigated the shooting on trial. He said that the defendant turned himself in on December 26 and that he attempted to take a statement from the defendant that evening, but that the defendant wanted his attorney present. On the morning of December 27, the defendant sent word from the jail that he wanted to talk to Williams. He took a written statement from the defendant in which the defendant reported the following: The defendant had been riding around in Sturdivant's car with Curtis Palmer, Draper Toliver, and Sturdivant. The men discussed a fight between Alvin Williams and Taylor that had taken place on Christmas Eve at the National Guard Armory. They rode down Tyus's street, and the defendant said he wanted to talk to Tyus. He and Sturdivant went to the door. Middlebrooks opened the door and started fighting with Sturdivant. Middlebrooks got away from Sturdivant and said he was going to kill Sturdivant. Middlebrooks went to the back of the house, and the defendant and Sturdivant left. Taylor came to the front of the house, and there was shooting from inside and outside the house. The defendant and Sturdivant left in Sturdivant's car.

Lieutenant Williams said there was no evidence to corroborate the defendant's claim that shots were fired from the house toward the defendant or any of his companions. He said the defendant only mentioned going to Tyus's house one time and did not mention having a gun. He said the police did not find any evidence that any of the residents or guests at Tyus's house before the defendant and Sturdivant arrived had a gun. He said Curtis Palmer pled guilty for his involvement, which was shooting at the kitchen door of Tyus's house. He said he did not know of Draper Toliver being involved other than as an occupant of Sturdivant's car. He said the investigation revealed that there was hostility between Taylor and Williams and between Sturdivant and Middlebrooks. He said Sturdivant was held from December 26 until December 29 but was not charged for assaulting Middlebrooks because that was a misdemeanor crime and Williams was focused on the homicide case. He said that he was aware that Middlebrooks was possibly a mistaken victim but that he had not heard the name Brian Brummitt in relation to the mistaken identity until the trial testimony. He said the shell casings found in Tyus's kitchen were determined to have been fired from Curtis Palmer's .380 handgun. He said they never recovered a handgun that matched the .40 caliber projectile from the bedroom that struck the victim.

Shelly Betts, a forensic scientist with the Tennessee Bureau of Investigation, testified as an expert in firearms identification. She examined the .40 caliber bullet recovered in this case and determined that it could not have been fired from the weapon that was recovered, which she identified as being ".380 Auto." She identified two exhibits consisting of two bullets and three bullets, respectively, as .380 Auto caliber bullets, which she determined had been fired from the submitted weapon.

Evan Sturdivant testified for the defense that he was with the defendant, Draper, and Palmer. They went to the home of Tyus, his second cousin, because he and the defendant wanted to talk to Tyus. He said he wanted to talk to Tyus about an altercation the previous evening involving himself, Williams, and Taylor. He said that he knew Middlebrooks because he was "dealing with [Middlebrooks'] baby's momma" and there was some tension between them.

Mr. Sturdivant testified that the defendant went inside Tyus's home alone and that he stayed in the car with Palmer and Draper. He said that he got out of the car to tell the defendant, "Let's go," and when he reached the porch, the defendant came outside and said that one of the people who had jumped on Sturdivant was inside. He said he opened the screen door, went inside, and talked to Middlebrooks briefly about having been jumped. He said the defendant followed him inside. He said that he and Middlebrooks got into a fight within seconds and that people came from the back room and "the gun came up." He said the people in the back shut the door. He said he backed off, Middlebrooks ran down the hall and tripped over a cord, and a shot was fired. He said he had not seen the defendant point the gun at anyone before the "gun came up." He said he assumed the defendant had the gun in his pocket. He said he did not know why the defendant would shoot at Middlebrooks.

Mr. Sturdivant said he heard only one shot. He said Palmer was not in the car when they left. He denied having seen any weapons other than the one the defendant had that night. He said that he was wearing rings and his beeper but that he did not have a gun in his waistband. He said he never saw Tyus or the victim in the house that night. He said he did not know whether the defendant told people not to move before the shot was fired because Sturdivant was focused on Middlebrooks and could not hear what the defendant was saying.

After receiving the evidence, the jury found the defendant guilty of first degree murder and attempted first degree murder. After the return of the verdict, the defendant agreed to accept a sentence of life without the possibility of parole for the first degree murder conviction in exchange for the state's agreement to withdraw its notice of intent to seek the death penalty. The defendant also agreed to a sentence of twenty-five years for the attempted first degree murder conviction. The trial court accepted the agreement and imposed the sentences.

On appeal, the defendant challenges the sufficiency of the convicting evidence. He contends that the state's evidence only establishes his guilt of criminally negligent homicide of Jamarius Thompson. The state counters that the defendant has waived our consideration of the issue by failing

to cite to the record or make substantive argument, and in any event, that the evidence sufficiently supports both convictions.

We consider first the state's waiver argument. The defendant's brief is lacking in specific, factual argument regarding his appellate issues, and the argument portion of his brief does not cite to the record. We agree with the state that the defendant's brief falls short of the requirements of Tennessee Rule of Appellate Procedure 27(a)(7), which requires an argument "setting forth the contentions of the appellant with respect to the issue presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on[.]" Notwithstanding the deficiency, the defendant's brief does contain citations to the record in its statement of facts, and the defendant's argument is not entirely lacking specific contentions. We will consider the defendant's sufficiency issues on their merits.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Criminal attempt requires that one act "with the kind of culpability otherwise required for the offense . . . [and] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101(a)(2). First degree murder is the unlawful, premeditated, and intentional killing of another. T.C.A. § 39-13-201, -202(a)(1). Premeditation is defined as:

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has delineated the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations

by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id.

In the light most favorable to the state, the evidence establishes that the defendant went to Harzel Tyus's home to speak with Tyus about previous altercations between Tyus's associates and the defendant and his associates. There was evidence of the previous altercations and of other tensions between Middlebrooks and his associates and the defendant and his associates. Before the defendant left the house the first time, he told the defendant he would not harm him or his family and made a statement about there being "trouble." The armed defendant returned between two and ten minutes later with Sturdivant, whom he instructed to take care of his business with Middlebrooks. Sturdivant attacked Middlebrooks, and the defendant hit Middlebrooks on the head with a gun. The defendant pointed the handgun at other occupants of the house and told them not to move. Tyus warned the defendant not to shoot because his child was present. However, as Middlebrooks was fleeing into the back of the house to get away from Sturdivant and the armed defendant, the defendant fired a shot which missed Middlebrooks but struck and killed the victim. There was no evidence that anyone other than the defendant who was inside the house was armed. Given the history of conflict involving the defendant and his associates and Middlebrooks and his associates, the defendant's statements of intent not to harm Tyus and his family but prediction of "trouble," the defendant's use of a handgun on an unarmed victim when no other weapons were present, Tyus's admonition not to shoot because a child was present, and the defendant's shooting at a fleeing victim, we conclude that there is sufficient evidence of premeditated first degree murder.

We note that the fact that the homicide victim was the sixteen-month-old child Jamarius, rather than Middlebrooks, is of no consequence. Criminal liability is not avoided because the victim was an unintended target. Millen v. State, 988 S.W.2d 164 (Tenn. 1999). The evidence demonstrates that the defendant intended a premeditated killing of Middlebrooks. The defendant's actions show his intent to cause Middlebrooks' death, although his actions felled Jamarius instead.

Finally, the transcript reflects that the defendant was sentenced to life without the possibility of parole for the first degree murder conviction. However, the judgment form for that count reflects a sentence of life with possibility of parole. Thus, we must remand this case to the trial court for correction of the first degree murder judgment form.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed. The case is remanded for correction of the judgment form for the first degree murder conviction.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

-8-